**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**HANOVER INSURANCE COMPANY**,
Petitioner,
v.

**CASE NO.: 9-23-CV-80829-RLR**

**ANDREA M. ZIDE** and
**STRACHUR WORLDWIDE LTD.**
Respondents.
_________________________________/

**RESPONDENTS' STATEMENT OF UNDISPUTED MATERIAL FACTS AND VERIFIED OPPOSITION TO PETITIONER'S MOTION FOR SUMMARY JUDGEMENT**[1]

**COME NOW,** Respondents, Andrea Zide and Strachur Worldwide Ltd, by and through the undersigned counsel, and file this, their **opposition** to, respectfully seeking denial of Petitioner's Motion for Summary Judgment and in support state as follows:

**PROCEDURAL HISTORY—NOT IN DISPUTE**

1. On March 7, 2023, Respondents Andrea Zide and Strachur Worldwide Ltd, filed an Amended Complaint against Harry Ross in case no. **50-2022-CA-012659-XXXX-MB** in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida. (**Exhibit 1 – Malpractice Amended Complaint, pp. 1-5**)

2. The Amended Complaint asserted five Counts against Ross: (I) Breach of Contract, (II) Conversion, (III) Legal Malpractice, (IV) Injunction, and (V) Negligence. (**Exhibit 1, p. 2**)

3. The Amended Complaint alleges that on October 17, 2022, Ross executed a contract (Escrow Agreement) to serve as escrow agent and that pursuant to afore mentioned escrow agreement, Ross received $1.2 million dollars from Respondents, which was held in his I.O.T.A. escrow account. (**Exhibit 2 – Escrow Agreement, pp. 1-9**)

[1] This opposition was due and prepared for filing in the evening of February 21, 2024. Unfortunately, it could not be filed due to an AT&T internet outage (https://www.yahoo.com/tech/t-outage-latest-phone-network-144645113.html). The undersigned apologizes to the Court and respectfully asks that, under the circumstances, the filing be deemed timely.



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

4. The Amended Complaint further alleges that the Escrow Agent shall not distribute the Escrow Deposit in any other fashion than what is defined in the escrow agreement. (**Exhibit 1, p. 2**)

5. The Amended Complaint alleges that Ross illegally, improperly, distributed and/or transferred $1.2 million to an unidentified, unauthorized third party. (**Exhibit 1, pp. 2-4**)

6. On July 13, 2023, Respondent Andrea Zide filed an Amended Complaint in case no. **50-2023-CC-008742-XXXX-MB** in the County Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, asserting three counts: defamation *per se*, tortious interference with business relationship and fraud. (**Exhibit 3 – Defamation Amended Complaint, pp. 1-4**)

7. The Amended Complaint for defamation is based on the allegation that on or about December 6, 2022, Ross defamed Respondent Zide by telling her counsel, Robert Rubin, Esq., that she was a money launderer, trying to deter Rubin from the case. (**Exhibit 3, pp. 1-4**)

8. Respondent Zide further alleges in her defamation complaint that the statement made by Ross that she was a money launderer constituted tortious interference with a business relationship. (**Exhibit 3, pp. 2-4**)

9. On May 25, 2023, Hannover Insurance Company filed a Complaint for Declaratory Relief, case no. **9-23-CV-80829-RLR**, where Petitioner Hanover seeks a judgment declaring that it has no duty to defend nor indemnify Ross or any other putative insured under the professional liability policy of insurance issued to Ross in relation to underlying claims brought by Andrea Zide and Strachur Worldwide Ltd. against Ross and filed in the Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County, Florida. (**Exhibit 4 – Declaratory Relief Complaint, pp. 1-7**)

10. Harry J. Ross was deposed on May 10, 2023. (**Exhibit 5 – Ross First Deposition, full transcript**)

11. Harry J Ross was deposed again on October 5, 2023.

12. Andrea Zide was deposed on August 31, 2023. (**Exhibit 6 – Zide Deposition, full transcript**)

## <u>THE INSURANCE POLICY</u>

13. On May 18, 2022, the Petitioner Hanover issued a Lawyers Advantage Professional Liability policy, number LHC H610287 01 to Harry J. Ross (the "Policy"). The Policy



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

effective dates were May 14, 2022, through May 14, 2023. (**Exhibit 7 – Insurance Policy, pp. 1-39**).

14. Subpart A.1., Coverage, Professional Services Coverage of the policy states in its pertinent part as follows (emphasis added):

> **We** will pay on **Your** behalf those sums which **You** become legal obligated to pay as **Damages** because of any **Claim** made against **You** for a **Wrongful Act**.

(**Exhibit 7, p. 4**)

15. The Policy defines Claim as follows (emphasis added):

> **Claim** means a:
>
> a. Written demand received by an Insured for Damages or Equitable Relief;
> b. Suit …
>
> All **Claims** made against any **Insured** that include, in whole or in part, allegations of **Wrongful Acts**, facts or circumstances that have a causal or logical connection will be considered one **Claim**. All such **Claims** will be considered first made at the time the earliest such **Claim** was made against any **Insured**. **Wrongful Acts**, facts or circumstances have a causal connection if the **Wrongful Acts**, facts or circumstances give rise, directly or indirectly, to the other such **Wrongful Acts**, facts or circumstances. **Wrongful Acts**, facts or circumstances have a logical connection if there is a goal, motive or methodology that is both common and central to the matters alleged. …

(**Exhibit 7, p. 7**)

16. The Policy, at **Exhibit 7, p. 10**, defines Professional Services as follows (emphasis added):

> **Professional Services** means advice given or services performed for others for a fee, as a:
> a. Lawyer, mediator, collaborative lawyer, arbitrator, notary public, administrator, conservator, receiver, executor, guardian, trustee, or in any **similar fiduciary capacity**, but only if the services rendered are those ordinarily performed by a lawyer.
> b. Law clerk, paralegal, legal secretary, notary public, or other legal support staff.
> c. Title insurance agent, title abstractor (including providing title opinions or title certifications), title searcher, **<u>escrow agent</u>**, or closing agent;…

17. The Policy, at **Exhibit 7, p. 10**, also defines what Professional Services are not (emphasis added):

> **Professional Services** does not mean:



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

> Any activity as a Certified Public Accountant, Insurance Broker or Agent (other than a lawyer acting as a Title Insurance Agent), or Real Estate Broker or Agent.

18. The Policy, at **Exhibit 7, p. 11**, defines Wrongful Acts as follows (emphasis added):

> **Wrongful Act** and **Wrongful Acts** mean any actual or alleged negligent act, error, omission, misstatement, or **Personal Injury** in the rendering of or failure to render **Your Professional Services**. When a **Claim** is based upon or arises out of more than one **Wrongful Act**, the date of all such **Wrongful Acts** shall be deemed to be the date of the first such **Wrongful Act**, whether prior to or during the **Policy Period**.

19. Subpart E.1.a., i., and j. of the Policy contains Exclusions to Claims or Supplemental Coverage Matter(s), based on conduct, bodily injury or property damage, misappropriation or false pretense, defined in the Policy (**Exhibit 7, pp. 11-12**) as follows (emphasis added):

> E. **EXCLUSIONS**
>
> a. This **Policy** does not apply to **Claim(s)** or **Supplemental Coverage Matter(s)** based upon, arising out of, or in any way relating to, directly or indirectly:
>
> A. Conduct
>
> Any **Insured** committing any intentional, dishonest, criminal, malicious or fraudulent act or omission. …
>
> g. Bodily Injury or Property Damage
>
> **Bodily Injury** or **Property Damage**, however, this exclusion 1.g does not apply to **Bodily Injury** for mental anguish, emotional distress, mental injury, shock or humiliation, caused by **Personal Injury**, or **Property Damage** to client records which are in **Your** care, custody, or control. …
>
> i. Misappropriation
>
> Any actual or alleged conversion, commingling, misappropriation, or improper use of funds, monies or property; or any inability or failure to safeguard or pay or collect any funds, notes, drafts, or other negotiable instruments, deposited in or payable from, any **Insured's** or former **Insured's** account, including an attorney trust account, or any resulting deficiency, overdraft or default.
>
> j. False Pretense
>
> Any transfer, payment or delivery of funds, money or property, by anyone, which was caused or induced by trick, artifice, or the misrepresentation of a fact including, but not limited to, funds transfer fraud, social engineering, computer



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

fraud, pretexting, phishing, spear phishing or any other confidence trick;…

20. Subpart C. of the Policy (**Exhibit 7, p. 6**) states the limit of liability and deductible as follows (emphasis added):

> 1. Limit of Liability
> The Limit of Liability shown on Item 3.a. of the Declarations page for each **Claim** is the most **We** will pay for the sum of all **Loss** arising out of a single **Claim** or related **Claims** and related **Supplemental Coverage Matters**, if such **Supplemental Coverages** are stated as part of, not in addition to, the Limits of Liability, regardless of the number of persons or entities insured under this **Policy**, number of **Claims** made, number of **Supplemental Coverage Matters** or the number of persons or entities making **Claims or Supplemental Coverage Matters** during the **Policy Period** or during any **Extended Reporting Period**.

## THE ESCROW AGREEMENT

21. On October 17, 2022, the Law Offices of Harry J. Ross ("Ross") entered into an Escrow Agreement with 40 Miller Street Trust, Strachur Worldwide Limited ("Strachur") and Instituto Sanitario De Seguros. (**Exhibit 2, pp. 1-5**)

22. The purpose of the escrow agreement (**Exhibit 2, p. 1**) was to facilitate a business deal where 40 Miller Street Trust, a private lender, was supposed to lend money to Strachur to buy an ownership interest in a small size Brazilian bank.

23. Zide sought the sum of $48,000,000.00 from 40 Miller Street Trust for the purchase (**Exhibit 2, p. 1**).

24. 40 Miller Street Trust, the lender, asked Zide to pay for administration fees and required Strachur to purchase payment insurance protection through Instituto Sanitario de Seguros, a Spanish insurance entity. Zide did not want to pay the lender any money upfront as she did not know them. The lender proposed to put the money in an escrow account with a lawyer and that was how they came up with Harry J. Ross as the escrow agent (**Exhibit 6, pp. 37-39**).

25. Strachur made a first wire transfer to Ross' escrow account of $200,000.00, for the administrative fees, and made a second wire transfer for $1 million dollars into Ross' escrow account (**Exhibit 8 – Wire Transfer Receipts from Banco Santander Miami**)

26. In total, Zide deposited $1.2 million dollars into Ross's escrow account. (**Exhibit 8 –**

**Wire Transfer Receipts from Banco Santander Miami**)

27. Per the escrow agreement (**Exhibit 2, p. 1-3**), within 48 hours after Strachur Worldwide Ltd. had made the deposit, 40 Miller Street Trust had to show Zide all the supporting documents regarding the funds.

28. The required Supporting Documents were not provided by 40 Miller Street Trust even past the two (2) day cutoff. Andrea Zide ultimately concluded funding was not going to occur (**Exhibit 6, p. 70-73**).

29. Zide/Strachur next requested that Ross terminate his duties as escrow agent and return the $1.2 million dollars to Strachur. (**Exhibit 9 – emails between Zide and Ross and Banco Santander**)

30. The Escrow Agreement (**Exhibit 2, p. 9**) has an Exhibit A which contains the following Distribution Instructions (emphasis added):

> Escrow Deposit shall be distributed as Follows:
> (b) **After the client company confirms in written and on video that it has received the full amount of the Loan (Forty-Eight Million United States dollars (USD $48,000,000.00) via a MT103/Wire Transfer) and the Insurance Company Issues the PPT Policy**, the remaining balance shall be distributed at the direction of the Insurance Company." (Emphasis in the original.) (**Exhibit 2, p. 9, subpart b**).

31. Zide conditioned the release of the money deposited in the escrow account of Ross if Zide gave him confirmation in writing and on video for the release of the money; otherwise, **Ross could not release the money**. (**Exhibit 2, p. 9**)

32. Zide would only agree to release the escrow money to 48 Miller once she had all the supporting documents and the $48 million. This never happened and Zide cancelled the deal and requested that the money in the escrow account be sent back to her account (**Exhibit 6 and Exhibit 9**).

33. Harry J. Ross distributed the funds to unauthorized third parties in violation of the Escrow Agreement.

## HARRY J. ROSS—PLAINTIFF'S STATEMENT

34. Mr. Ross, a Florida licensed attorney since 1990, became involved in this matter when Andrea Zide sent him on October, 2022, an email in reference to a possible escrow agreement (**Exhibit 9, p. 1**).



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

35. Ms Zide was referred to Mr Ross by 40 Miller Street Trust, the lender named in the Escrow Agreement (**Exhibit 2, header**).

36. Ms Zide called Mr Ross and exchanged several text messages (**Exhibit 10 – text messages – Redacted to remove personal identifying information**) with him in order to ensure that he could act as Escrow Agent for the business transaction between her company Strachur Worldwide (Client Company in the Escrow Agreement) and 40 Miller Street Trust (Lender in the Escrow Agreement).

37. In the text messages, Harry J Ross assured Ms Zide that, although he was not familiar with 40 Miller Street Trust, he came in contact with 40 Miller Street Trust through longtime friends and clients that he trusted personally (**Exhibit 10, p. 2**)

38. Harry J. Ross served as the **escrow agent** for the Client Company identified in the Escrow Agreement (**Exhibit 2, header**), Strachur Worldwide Ltd, whose main shareholder and Director is Andrea Zide.

39. Ross then received two wire transfers, one for $200,000 and one for $1 million from Banco Santander, for a total of $1.2 million dollars (**Exhibit 8, pp. 1-2**).

40. Ross had a duty to make sure that the $1.2 million in the escrow account was safeguarded (**Exhibit 2, pp. 1-7**).

41. Ross, as the escrow agent, had to follow the terms of the Escrow Agreement (**Exhibit 2, pp. 1-7**).

42. Ross, as the escrow agent, had to make sure that funds were safeguarded (**Exhibit 2, pp. 1-7**).

43. In his deposition (**Exhibit 5**), Harry Ross claims that "Craig Hubner" identified Zide/Strachur's transaction involving the Escrow Agreement as a money laundering scheme. (**Exhibit 5, pp. 33-35**).

44. In his deposition, Harry Ross also claims that, after he received the $1.2 million dollars in funds to be escrowed, "Iztok Plevnik" comes into the picture. (**Exhibit 5**, **p. 56, ll. 18 – 25**). Plevnik supposedly informs Ross that the $1.2 million dollars was money laundering by Zide. (**Exhibit 5**, **p. 57, ll. 8 – 21**).

45. On November 9th, 2023, Ross received an email communication from Andrea Zide telling him that the transaction was not going forward. (**Exhibit 9, p. 2**).



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

46. However, in his emails (**Exhibit 9**), Ross never mentions suspicions of any *money laundering scheme*.

47. Banco Santander Officer, Ms. Helena Yamashita, replies to Ross' emails, providing him with bank official documents and records (**Exhibit 13**) proving that Zide was legitimate.

48. Ross forwarded the money ($1.2 million) to Plevnik's LLC **private** Wells Fargo account (**Exhibit 11 – Letter from Plevnik to Ross**).

49. The account in Wells Fargo in San Francisco, California, was in the name of IPB- SI, LLC, which was owned and controlled by Plevnik (**Exhibit 11**), as Ross was well aware.

50. On November 15, 2022, Ross wire transferred $200,000.00 to Plevnik's Wells Fargo Bank account and on November 17, 2022, Ross wire transferred $1,000,000.00 into the same account.

51. Ross was promised a fee of up to $200,000 in return for his services as escrow agent. And indeed, Ross received his fees from Plevnik (**Exhibit 12**).

52. Of the $1.2 million that was transferred, $200,000 remains in his escrow account. **The fee amount of $200,000 was given to Ross**. (**Exhibit 5**, **p. 114, ll. 18 – 21**).

53. Ross tried to "cover his tracks" by demanding that Plevnik sign a letter (**Exhibit 13**). releasing Ross from any further responsibility regarding the safeguard of the funds.

54. Ross knew that the United States government had nothing to do with Plevnik's private bank account. (**Exhibit 5**, **p. 124, ll. 12 – 14)**.

55. Ross did not have written authorization from Zide to distribute the money, nor did he have her video authorization. (**Exhibit 5, p. 132, ll. 8 – 20**).

## DEFAMATION PER SE AND TORTIOUS INTERFERENCE ARE DISTINCT CLAIMS — WITH A SEPARATE PER CLAIM LIMIT

56. On or about December 6, 2022, Attorney Rubin first communicated with Ross.

57. Ross told Rubin that Zide was a money launderer. Ross also told Rubin that:

a. The FBI/Department of the Treasury was investigating.
b. The $1.2 million was still in his trust account.
c. Ross stated he would transfer the 1.2 million to Rubin's trust account.
d. However, Ross advised that he wanted to protect Rubin from involvement in a money laundering scheme.
e. Ross was trying to deter Rubin from this case.



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

58. All the above was fraudulent and false.

59. Ross contacted the FBI only after he was accused of illegally violating all three terms of the escrow agreement.

60. When the FBI/Treasury Department investigated, they found nothing.

61. Even though Ross promised to transfer the 1.2 million to Rubin's trust account, the truth is Ross had already unauthorizedly disposed of the funds and could not transfer them to Rubin's trust account.

62. Here, a different type of liability arises from Ross' actions: an extra-contractual liability distinct from the civil liability arising from the breach of the escrow agreement (contract).

63. Hannover's insurance policy contains both coverages – coverage for contractual liabilities (originating from Ross' breach of contractual obligations, **gross negligence and malpractice**) as well as coverage for extra-contractual liabilities (originating from Ross' actions or omissions or wrongful acts).

64. The definition of 'wrongful act' is given in Hanover's insurance policy (emphasis added):

> Wrongful Act and Wrongful Acts mean any actual or alleged negligent act, error, omission, **misstatement**, or Personal Injury in the rendering of or failure to render Your Professional Services. When a Claim is based upon or arises out of more than one Wrongful Act, the date of all such Wrongful Acts shall be deemed to be the date of the first such Wrongful Act, whether prior to or during the Policy Period.

65. In both matters (Ross' contractual liability and Ross' extra-contractual liability), **primary insurance has been triggered**. The primary insurance refers to the first layer of coverage that applies when a covered liability or loss takes place.

66. In this case, there are two separate claims, each giving rise to a primary insurance trigger: (***1***) The first insurance claim was triggered when Harry J. Ross failed to observe the escrow agreement provisions and distributed the funds in his escrow accounts to unauthorized third parties (malpractice claim); and, (***2***) The second insurance claim was triggered when Harry J. Ross interfered with Rubin and defamed Zide (tortious interference and defamation per se claims).

67. Hanover's insurance policy expressly provides the limit of $ 500,000 per claim and **<u>the limit of $1,000,000 for all claims</u> <u>in the aggregate</u>**.



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

Item 3. LIMIT OF LIABILITY
a. $500,000 or each Claim; not to exceed
b. $1,000,000 for all Claims in the Aggregate

68. The claim for breach of the escrow agreement has a liability limit of $ 500,000 and the claim for defamation per se and tortious interference has a distinct liability limit of $ 500,000 – both totaling $ 1,000,000 limit in the Aggregate.

69. In *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 153 Ariz. 129, 735 P.2d 451 (1987), the Arizona Supreme Court asked whether 'related' implied a logical or causal meaning. *Helme* helps to identify a number of factors that courts have used as footholds when attempting to determine 'relatedness'. The prevalent factors include:

- the identity of the claimants;
- the number of underlying causes or acts – separate acts producing separate claims will produce unrelated claims;
- the number of underlying results – separate wrongful acts contributing to different harms weighs against relatedness.

70. Here, all three factors favor <u>two distinct limits</u>:

- The plaintiff in the malpractice case is Strachur Worldwide, while the plaintiff in the defamation case is Andrea Zide, personally.
- The outrageous acts of Ross are totally different, both as to <u>nature</u> and <u>time</u>.
- The malpractice lawsuit involves Strachur and Ross, while the defamation and tortious interference involves Ross and Zide and Rubin.

71. Finally, the damage results are completely different.

- Strachur Worldwide suffered a $1.2 million dollar loss from Ross' malpractice and gross negligence. On the other hand, Zide suffered damage to her reputation, damage to her long-lasting relationship with Santander Bank, great verbal and moral distress, and not last, damage to her relationship with her trusted attorney.

72. In *Lexington Ins. Co. v. Lexington Healthcare Grp., Inc.*, 84 A.3d 1167 (Conn. 2014), multiple residents of a Connecticut nursing home tragically perished or were injured when the facility was set ablaze by another resident. As a result, 13 negligence actions seeking damages for wrongful death or serious bodily injury were filed against the facility. The Connecticut Supreme Court held that the various negligence claims stemming from the same nursing home fire were not sufficiently related to constitute a single 'medical incident' within the meaning of the professional liability policy. Consequently, the $500,000 per medical incident limit provided



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

in the policy applied to each individual claimant, rather than all the claims as a whole. The court concluded that the phrase 'related medical incidents' did not clearly and unambiguously encompass incidents in which multiple losses are suffered, **when each loss has been caused by a unique set of negligent acts, errors omissions by the insured**, even though there might have been a "common precipitating factor".

73. Here, Harry J. Ross (the insured) committed **different sets of negligent acts, each one producing different harm and different loss**, involving different parties.

74. **Each set of negligent acts by Ross produced different harm and different loss.**

## MEMORANDUM OF LAW

**Was Harry J. Ross grossly negligent or was he duped?**
**Or is he attempting to dupe the Court now?**

Beyond gross negligence, there is a question of fact whether Ross was duped or if he knew that he was transferring the money to an unauthorized third party.

There is also a question of fact of how much Ross was motivated by a $200,000 fee. Those are questions for a jury, not summary judgment.

"**What a person intended, knew or believed is a question of fact**. Since only the person himself is in a position to give direct evidence of his subjective thought processes at a given moment, and **since his testimony may be accorded only limited weight**, the jury may have to draw inferences from what he said and did. There is agreement that such inference-drawing constitutes fact-finding." (**California Law Review, vol. 54, n. 5, p. 1870**)

Even if Ross was both – grossly negligent and duped – the question for the jury remains:

### Which factor was the proximate cause of his malfeasance?

## TRUST ACCOUNT—A SACRED FIDUCIARY RESPONSIBILTY

The deposit of clients' funds into a trust account creates a fiduciary relationship between those clients and the law firm. See *Nardella Chong, P.A. v. Medmarc Cas. Ins. Co.*, 642 F.3d 941 (11th Cir.2011).

In *Kenet v. Bailey*, 679 So.2d 348 (Fla. 3d DCA 1996), the Florida 3rd DCA:

> When an attorney receives money from his client to place into the attorney's trust account for the client's purpose, a fiduciary relationship is established and



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

> a failure to return the money on demand (or to use it as instructed) carries with it substantial potential consequences. Misuse of a client's funds (for they are that even though deposited in a bank account physically controlled by the attorney) is one of the most serious offenses a lawyer can commit.

**<u>TRUST ACCOUNTS ARE PROFESSIONAL SERVICES COVERED BY THE POLICY</u>**

The management of these funds held in trust for clients constitutes a "professional service" as defined by Medmarc's policy. The policy states that professional services includes those rendered by the law firm as a "trustee or in any similar fiduciary capacity" as long as "those services are typically and customarily performed by an attorney."

Here **Ross' unauthorized transfer of its clients' funds to a third party was unquestionably a breach of his professional fiduciary duties to its clients (Strachur Worldwide and Andrea Zide) that would give rise to a claim of negligence against it by those clients and for which it would have been liable in damages. Such a claim for a negligent act or omission <u>must</u> be covered by the policy issued by Hanover to Ross, as a matter of public policy.**

Ross' two depositions (attached) demonstrated an alleged astounding ignorance of the law. Was this an attempt to disguise his greed for a windfall of $ 200,000 fee or are we being "duped" by his feigned ignorance? The disputed facts have been demonstrated by the emails, text messages and letters (**Exhibits 9, 10, 11, 12, 13**).

**<u>POLICY LIMITATIONS ARE CONSTRUED NARROWLY</u>**

[E]xceptions, limitations, and exclusions to insurance agreements require a <u>narrow construction</u> on the theory that the insurer, having affirmatively expressed coverage through broad premises assumes a duty to define any limitations on that coverage in clear and explicit terms. *U.S. Fid. & Guar. Co. v. Park'N Go of Ga., Inc.*, 66 F.3d 273, 278 (11th Cir.1995) (internal quotation marks omitted). "Any exclusion sought to be invoked by the insurer is to be liberally construed against the insurer unless it is clear and unequivocal." *Id*. Further, a court must not interpret a policy to allow an insurer to provide largely <u>illusory</u> coverage. In other words, "public policy disfavors insurance provisions that permit the insurer, at the expense of the insured, to avoid the risk for which the insurer has been paid and for which the insured reasonably expects it is covered." *Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 696 S.E.2d 326, 330 (Ga.Ct.App.2010) (internal alterations and quotation marks omitted).

**"Professional services" in the policy explicitly covers Ross' duties as 'escrow agent.'**

**<u>REASONABLE EXPECTATIONS AND *CONTRA PROFERENTEM*:</u>**
**<u>TWO DOCTRINES TO BE ENFORCED IN INSURANCE COVERAGE LITIGATIONS</u>**



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

U.S. Courts have long adopted a policy with regard to the interpretation of standard forms of insurance contract known as the “reasonable expectations” doctrine. Following this doctrine, courts have consistently accepted the argument that they should honor the **reasonable expectations** of an insured in situations where the policy is ambiguous despite the presence of policy provisions, which would appear to negate coverage.

The doctrine was extended to its present form in the case of *Steven v. Fidelity & Cas. Co. of New York*, 58 Cal.2d 862, 27 Cal.Rptr. 172, 377 P.2d 284 (1963).

By 1980 one author had counted well over 100 cases supporting the doctrine. *See* Abraham, “Judge-Made Law and Judge-Made Insurance: Honoring the Reasonable Expectations of the Insured”, 67 Va. L. Rev. 1151 (1981). **The doctrine has been extended to give effect to the reasonable expectations of policyholders to cases that did not involve ambiguous provisions in the policy.**

The doctrine of reasonable expectation of the parties has evolved from being applicable only in cases of ambiguity to a doctrine that can be relied upon when insurance provisions are clear and straightforward.

**The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored**, even though painstaking study of the policy provisions would have negated those expectations. (R. Keeton, “Insurance Law Rights at Variance with Policy Provisions” (1970), 83 Harv. L. Rev. 961, at p. 967.)

In “Insurance Law: The Doctrine of Reasonable Expectations” (1988, 37 Drake L. Rev. 741, at pp. 746-47), Holz sets out the this approach: ... the reasonable expectations of a policyholder, having an ordinary degree of familiarity with the policy coverage, should be given effect for three reasons: (1) policy forms are long and complex and cannot be understood without detailed study; (2) rarely do policyholders read their policies carefully enough to acquire such understanding; (3) most insurance transactions are final before a policyholder has a chance to see the detailed policy terms.

More recently, in *Crum & Forster Specialty Ins. Inc. v. DVO, Inc.*, 939 F.3d 852 (7th Cir. 2019), the Seventh Circuit held that, according to insurance policy interpretation principles, an insurer may not avoid its coverage responsibilities by invoking an exclusion that is broad enough to fully encompass the scope of the coverage grant, thus rendering the policy illusory. The court, accordingly, concluded that the scope of the breach of contract exclusion as written was broader than the professional liability insuring agreement, thus rendering the E&O coverage illusory.

The 7th Circuit also found that, under modern law, **illusory insurance coverage must be reformed to meet the insured’s reasonable expectations, which requires a trial court to**

**consider the intended role of the coverage and, under these particular circumstances, enforce coverage**.

## ILLUSORY COVERAGE x EQUITABLE PRINCIPLES

This case is an important reminder that, under settled principles of insurance policy interpretation, **insurance policies must (and should) be applied consistently with the insured's purpose and intent in purchasing the coverage**. Insureds should keep these equitable principles in mind when asserting their coverage rights, especially under circumstances where the policy at issue is written on standard coverage forms drafted unilaterally by the insurance industry.

Of course, Harry J. Ross' expectation, when purchasing coverage for his practice as "escrow agent", was to be defended and indemnified whenever mishandling funds deposited in his escrow account. It is indeed a reasonable expectation from Mr. Ross.

**Why would Mr. Ross pay an insurance premium to cover his professional services as escrow agent if a policy exclusion prevents any insurance coverage for mishandling or failing to safeguard funds held in escrow?**

Once illusory coverage is triggered—that is, once the court has found a policy to contain illusory coverage—the right remedy is to reform the offending exclusions — and only the offending exclusions — **to conform to the policyholder's reasonable expectations regarding their coverage**. Thus, if an insurer denies coverage on the sole basis of an exclusion or set of exclusions that render the coverage illusory, the court should require the insurer to provide coverage if and only if the policyholder had a **reasonable expectation** that the policy made such coverage available.

In *Great Northern Ins. Co. v. Greenwich Ins. Co.*, 2008 WL 2048354, (W.D. Penn. May 12, 2008), the court held that "[t]he question [of whether the illusory coverage is triggered] is **whether a particular coverage provision is swallowed-up by an exclusion,** not whether the policy as a whole provides some degree of coverage despite the existence of an exclusion." The court went on to clarify that a "coverage provision" is any single kind of risk that an insuring clause describes as being covered. Under the court's approach, there is no unit of coverage within a policy that is too small for protection. **If one exclusion defies the purpose of the policy and the reasonable expectations from the insured, then coverage must be enforced.**

## CONCLUSION

The facts as to Ross' state of mind are disputed. A jury could reasonably find there was no trick, no false pretense; no misappropriation.



LAW OFFICE OF ROBERT I. RUBIN, ESQ.
370 CAMINO GARDENS BLVD • SUITE 300 • BOCA RATON, FL 33432
TELEPHONE (561) 322-5752

Ross' reasonable expectations for the insurance policy should be taken under consideration as he paid the premium to get coverage for his "escrow agent" practice.

In addition, defamation per se and tortious interference are separate and distinct covered claims, with an additional $500,000 limit each. The Aggregate limit of the insurance policy is $1,000,000.

**WHEREFORE**, the Respondents, Andrea M. Zide and Strachur Worldwide Ltd., by and through her undersigned counsel, hereby oppose Hanover's Motion to Summary Judgment and respectfully ask that this Honorable Court deny said motion.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on this 22nd day of February, 2024, I electronically filed the foregoing document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By:______________________
Robert I. Rubin, Esq.
Florida Bar No. 7293
Counsel for Plaintiff
Telephone: (561) 322-5752
E-Mail: robertianrubin1958@gmail.com
pleadingsrir@gmail.com

## VERIFICATION[2]

Andrea Zide, being duly sworn, deposes and says, my opposition to Hanover's motion for summary judgment is true.

______________________________
Andrea Mansour Zide

______________________________
Notary Public

[2] A notarized verification, executed on February 21, 2024 is attached to this motion separately.